FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 14, 2026

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ELANA W.,[1]<br>Plaintiff,<br>v.<br>FRANK BISIGNANO, COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | No. 1:26-cv-03056-RLP<br><br>ORDER AFFIRMING THE COMMISSIONER'S DECISION |

BEFORE THE COURT is Plaintiff Ms. W.'s appeal from the Commissioner of Social Security's partially favorable final decision denying disability insurance benefits under Title II of the Social Security Act but finding her disabled beginning

[1] The court identifies a plaintiff in a social security case only by the first name and last initial in order to protect privacy. *See* LCivR 5.2(c).

December 3, 2023, for purposes of supplemental security income under Title XVI. The Court considered the matter without oral argument.

For the reasons discussed below, the Court concludes the ALJ's decision is supported by substantial evidence. Therefore, Ms. W.'s brief, ECF No. 9, is denied and the Commissioner's brief, ECF No. 11, is granted.

BACKGROUND

Ms. W. was born in December 1968 and has at least a high school education. Tr. 29, 260. She has past work as a housekeeping cleaner. Tr. 28. She alleges disability beginning January 20, 2020, principally because of chronic back pain and right foot drop. Tr. 22, 258-64.

Ms. W. protectively filed concurrent Title II and Title XVI applications on April 17, 2022, alleging disability beginning January 20, 2020. Tr. 17, 224-26. Her insured status expired June 30, 2021. Tr. 17, 235. The agency denied her applications initially in January 2023 and on reconsideration in February 2024. Tr. 17. Ms. W. requested a hearing, and she and a vocational expert (VE) testified before ALJ S. Pines on February 26, 2025. Tr. 17, 95-113. The ALJ issued a partially favorable decision on March 26, 2025. Tr. 14-31. The Appeals Council denied review on February 4, 2026, making the ALJ's decision the Commissioner's final decision. Tr. 1-6. Ms. W. now appeals to this Court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g). The scope of review under § 405(g) is limited; the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). Substantial evidence is "more than a mere scintilla," but "may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation modified). "While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice." *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation modified). Where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## FIVE-STEP EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the meaning of the Social Security Act. First, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Second, the claimant's impairment must be "of such severity that he is not only unable to do [his or her] previous work[,] but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). At step one, if the claimant is engaged in "substantial gainful activity," the Commissioner must find the claimant is not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the Commissioner considers the severity of the claimant's impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the Commissioner compares the claimant's impairment to severe impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the severity of the claimant's impairment does not meet or exceed the severity of the enumerated impairments, the Commissioner must assess the claimant's residual functional capacity (RFC), which is the claimant's ability to

perform physical and mental work activities on a sustained basis despite his or her limitations, 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work he or she has performed in the past (past relevant work). 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If not, the analysis proceeds to step five and the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the analysis proceeds to step five, the burden shifts to the Commissioner to establish (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers in the national economy." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

## ALJ'S FINDINGS

At step one, the ALJ found Ms. W. had not engaged in substantial gainful activity since January 20, 2020, the alleged onset date. Tr. 19. Although Ms. W. had earnings in 2020 and 2021, the ALJ found that work did not rise to the level of substantial gainful activity. Tr. 19-20.

At step two, the ALJ found Ms. W. had two severe impairments: degenerative disc disease with right foot drop and somatic symptom disorder.

Tr. 20.

At step three, the ALJ found Ms. W. did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 20-21. In assessing the paragraph B criteria, the ALJ found mild limitations in understanding, remembering, or applying information and interacting with others, and moderate limitations in concentrating, persisting, or maintaining pace and adapting or managing oneself. Tr. 20-21.

Before proceeding to step four, the ALJ found Ms. W. had the residual functional capacity (RFC) to perform light work with additional limitations. Tr. 21. Specifically, Ms. W. could stand and walk for a combined total of four hours and sit for six hours; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and have occasional exposure to extreme temperatures, vibration, pulmonary irritants, and hazards. *Id.* The ALJ further limited Ms. W. to understanding, remembering, and carrying out simple instructions; making simple work-related decisions; and dealing with occasional changes in a routine work setting. *Id.*

At step four, the ALJ found Ms. W. could not perform her past relevant work as a housekeeping cleaner because that work required standing and walking for more than four hours per workday. Tr. 28-29.

At step five, relying on vocational expert testimony, the ALJ found that before December 3, 2023, Ms. W. could perform four representative occupations:

production assembler, with 9,000 jobs nationally; parking lot attendant, with 25,000 jobs nationally; office helper, with 4,000 jobs nationally; and agricultural produce sorter, with 4,000 jobs nationally. Tr. 29-30. The ALJ therefore found 42,000 jobs existed in the national economy that Ms. W. could perform and concluded she was not disabled before December 3, 2023. *Id.*

On December 3, 2023, Ms. W.'s age category changed to an individual of advanced age. Tr. 29. The ALJ found Medical-Vocational Rule 202.04 directed a finding of disability beginning on that date. Tr. 30. Accordingly, the ALJ found Ms. W. disabled for purposes of her Title XVI claim beginning December 3, 2023, but not disabled before that date. Tr. 30-31. Because her insured status expired on June 30, 2021, the ALJ also found she was not entitled to Title II disability benefits. *Id.*

## DISCUSSION

Ms. W. contends the ALJ erred by improperly evaluating her symptom testimony, failing to fully and fairly develop the record, improperly evaluating the medical opinion evidence, and failing to carry the Commissioner's burden at step five. The Court addresses Ms. W.'s arguments in turn.

### A. Symptom Testimony and Duty to Develop the Record

Ms. W. argues the ALJ improperly discounted her testimony concerning the severity of her physical symptoms and resulting limitations. She challenges eight aspects of the ALJ's reasoning: (1) her reason for stopping work and the ALJ's

related findings concerning her prior ability to work and the absence of worsening symptoms around onset; (2) her limited treatment for back pain; (3) the lack of objective findings before the January 2024 consultative examination; (4) the ALJ's finding that she appeared more limited by January 2024; (5) improvement with osteopathic manipulation treatment (OMT) and yoga; (6) her report she could lift 10 to 20 pounds; (7) the absence of allegations or treatment for a mental impairment; and (8) her activities of daily living. ECF No. 9 at 4-16. The Court addresses each argument in turn after a review of the relevant legal principles.

An ALJ must conduct a two-step analysis to determine whether to discount a claimant's testimony regarding subjective symptoms. SSR 16-3p, 2017 WL 5180304, at *3. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Molina*, 674 F.3d at 1112 (citation modified). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

"The clear and convincing standard is the most demanding required in Social Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are insufficient; rather, the ALJ must identify what symptom claims are

being discounted and what evidence undermines these claims. *Ghanim*, 763 F.3d at 1163 (quoting *Lester v. Chate*r, 81 F.3d 821, 834 (9th Cir. 1995)); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why they discounted the claimant's symptom claims).

Here, the ALJ found Ms. W.'s medically determinable impairments could reasonably be expected to cause her alleged symptoms but concluded her statements concerning their intensity, persistence, and limiting effects were not fully supported. Tr. 22. There is no affirmative finding of malingering. The specific, clear, and convincing standard therefore applies.

### 1. Reason for Stopping Work

The ALJ first discounted Ms. W.'s symptom testimony based on the circumstances surrounding why she stopped working and her prior work history. Tr. 22. The ALJ noted Ms. W. testified she stopped working because of COVID-19, which conflicted with her disability report stating she stopped working because of her medical conditions. *Id*. The ALJ also reasoned Ms. W. had experienced back pain before the alleged onset date but nevertheless had been able to work, including full-time work in the past. *Id*. Finally, the ALJ found Ms. W. did not report a significant increase in back pain around the time she stopped working. *Id*.

Ms. W. argues these findings are inconsistent with her earnings history and the contemporaneous medical evidence. ECF No. 9 at 5-6. She contends her earnings before the alleged onset date were limited and she worked only about 16

hours per month as a housekeeper immediately before she stopped working. *Id*. at 5. She also argues her reported January 2020 work stoppage preceded the COVID-19 pandemic, she later earned a small amount from Project Patch in 2021, and she unsuccessfully sought other work that could accommodate her physical limitations. *Id*. at 5-6. Finally, she points to treatment records from late 2019 and early 2020 documenting increased pain and new complaints of numbness and weakness. *Id*. at 6.

The Commissioner responds Ms. W. gave inconsistent explanations for why she stopped working and the ALJ reasonably resolved that inconsistency. ECF No. 11 at 4. The Commissioner further argues the ALJ accurately summarized Ms. W.'s October 2023 report of longstanding back pain and the absence of a report during that examination of a significant increase in back pain around the time she stopped working. *Id*. at 5.

Substantial evidence supports the ALJ's finding that Ms. W. gave inconsistent explanations for why she stopped working. At the hearing, Ms. W. testified she "lost [her] job because of COVID." Tr. 101. She similarly told Dr. Schultz in October 2023 that she stopped working because of COVID. Tr. 429, 432. But her April 2022 disability report states she stopped working on January 20, 2020, because of her medical conditions. Tr. 259. Although Ms. W. points out the reported January 2020 date preceded the pandemic and she later earned $409.12 from Project Patch in 2021, ECF No. 9 at 5-6, those circumstances do not eliminate

the inconsistency in her explanations for why she stopped working. Because the ALJ reasonably interpreted those statements as inconsistent, that inconsistency was a specific, clear, and convincing reason to discount Ms. W.'s symptom testimony.

Substantial evidence also supports the ALJ's finding that Ms. W. had worked full time in the past despite longstanding back pain. Tr. 22. Ms. W. reported working as a line leader eight hours per day, five days per week from 2005 to 2009. Tr. 260-61. But that earlier work does not directly contradict her allegation that her back condition later worsened and became disabling around January 2020. Indeed, her work immediately before the alleged onset date was part-time, and she testified she worked only about 16 hours per month. Tr. 22, 102; ECF No. 9 at 5. Accordingly, although the ALJ's factual finding is supported by substantial evidence, it provides only limited support for discounting Ms. W.'s symptom testimony concerning the period at issue.

Substantial evidence also supports the ALJ's finding that Ms. W. did not report a significant increase in back pain around the time she stopped working. Tr. 22. Although the records document worsening symptoms in late 2019, including 10/10 pain in October and 7-10/10 pain with numbness and weakness in December, Tr. 392, 396, they do not show a further significant worsening around the January 20, 2020 alleged onset date. At the January 20 visit, Ms. W. continued to report back pain and received osteopathic manipulation, but examination showed normal gait and station. Tr. 385-86. By February 24, 2020, she reported

she was "feeling much better overall," was doing daily yoga, and had minimal pain. Tr. 382. Thus, although the record reflects worsening symptoms during late 2019, substantial evidence supports the ALJ's finding that Ms. W. did not report a significant increase in back pain around the time she stopped working and the ALJ's resulting inference that her symptoms were not as limiting as alleged at the onset date.

Accordingly, substantial evidence supports the ALJ's findings that Ms. W. gave inconsistent explanations for why she stopped working, had previously worked full time despite longstanding back pain, and did not report a significant increase in back pain around the alleged onset date. Tr. 22. Ms. W.'s inconsistent explanations and the absence of a significant increase in symptoms around onset provided specific, clear, and convincing reasons to discount her symptom allegations. Her prior work history provided additional, though limited, support for the ALJ's evaluation.

### 2. Limited Treatment & Duty to Develop

The ALJ next discounted Ms. W.'s allegations based on her limited treatment for back pain. Tr. 22-23. The ALJ noted Ms. W. received osteopathic manipulation treatment (OMT) for back pain in early 2020 but sought little additional evaluation or treatment after February 2020. Tr. 22-23. The ALJ further observed Ms. W. obtained treatment during this period for other conditions, including a foot fracture and an insect sting, which suggested she could have

obtained additional treatment for her back pain. Tr. 23. The ALJ concluded the limited course of treatment was inconsistent with the degree of limitation Ms. W. alleged. *Id*.

Ms. W. argues the ALJ failed to consider possible reasons for her limited treatment as required by SSR 16-3p. ECF No. 9 at 6-7. She notes her insurance limited the number of acupuncture visits available in 2019 and argues it is "unclear" whether she continued to have insurance or was otherwise limited by finances. *Id*. She further argues the ALJ improperly relied on isolated treatment for acute conditions in 2022 to infer she could have obtained continuing back treatment. *Id*. Ms. W. also contends the treatment record was incomplete. *See id*. She points to references to acupuncture, massage, physical therapy, chiropractic and neurosurgical care, and argues the ALJ failed to develop the record after counsel advised at the hearing that additional medical records might exist. *Id*. at 7-9.

The Commissioner responds that Ms. W. identifies no evidence that financial or insurance barriers actually prevented her from obtaining treatment. ECF No. 11 at 5. The Commissioner further argues the references to additional providers either contained the relevant information or did not establish that Ms. W. actually received additional treatment. *Id*. at 6.

The ALJ permissibly considered Ms. W.'s limited course of treatment. An ALJ may consider treatment that is inconsistent with the alleged severity of a

claimant's symptoms. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). But an ALJ may not discount symptoms based on a failure to seek treatment without considering possible reasons the claimant did not obtain treatment consistent with the degree of limitation alleged. SSR 16-3p, 2017 WL 5180304, at *9-10.

Here, the record does not identify a reason that adequately explains the lengthy gap in treatment. Ms. W. points to an October 2019 record stating her insurance covered only three acupuncture visits. Tr. 392. But that evidence establishes only a limitation on acupuncture treatment at that time. Ms. W. identifies no evidence she later lacked insurance, could not afford medical care, or otherwise was unable to obtain treatment for her back condition. Her argument that it is "unclear" whether she had insurance or was limited by finances, ECF No. 9 at 6, is therefore speculative. The record therefore provides no basis to attribute the lengthy treatment gap to a financial or insurance barrier.

Nor did the ALJ fail to develop the record. That duty is triggered when the evidence is ambiguous or inadequate to permit evaluation. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). But "speculation as to the existence of outstanding material records is not sufficient to show that the record before the ALJ was inadequate and that the ALJ therefore had a duty to further develop the record." *Larkin v. Berryhill*, No. C17-1689-BHS-JPD, 2018 WL 4103253, at *6 (W.D. Wash. June 22, 2018), *aff'd sub nom. Larkin v. Sau*l, 819 F. App'x 535 (9th

Cir. 2020).

At the hearing, counsel explained his office had requested records from the sources Ms. W. had identified, had received the responsive records, and had no pending requests, although "there might be some more" because counsel had experienced difficulty maintaining contact with Ms. W. Tr. 100. Ms. W.'s speculation that additional records might exist did not render the existing record ambiguous or inadequate.

The references to other providers do not alter that conclusion. The record reflects Ms. W. reported favorable results from acupuncture, although her insurance covered only three visits, and short-lived relief from massage. Tr. 392. The record also references planned physical therapy and referrals to a chiropractor and neurosurgeon. Tr. 394-96. But the record does not establish Ms. W. actually obtained additional treatment from those sources. And although a December 2019 note states she had spoken with spinal surgeons, including Dr. Atteberry, it also records the relevant outcome: surgery was not recommended. Tr. 398. On this record, the ALJ was not required to obtain additional records that counsel could not confirm existed.

Accordingly, substantial evidence supports the ALJ's finding that Ms. W. received limited treatment for back pain after February 2020. Given the absence of evidence adequately explaining that treatment gap, the limited treatment provided a specific, clear, and convincing reason to discount the alleged severity of her symptoms.

3. Objective Medical Findings

The ALJ next found the clinical findings before the January 2024 consultative examination did not support the degree of limitation Ms. W. alleged. Tr. 22-23. She noted examinations generally showed limited pain behavior, normal gait without an assistive device, and no neurological deficits. *Id*. Although an August 2022 x-ray of Ms. W. showed grade II anterolisthesis and marked disc-space narrowing, which the ALJ acknowledged was consistent with Ms. W.'s allegations of back pain, she concluded the clinical findings supported light work with reduced standing and walking. Tr. 23.

Ms. W. first argues reliance on the absence of "pain behavior" or "signs of distress" is inappropriate for a chronic pain condition. ECF No. 9 at 9. She next argues the January and February 2020 records cited by the ALJ did not include strength, reflex, or range-of-motion testing, while nevertheless documenting hyperlordosis, pelvic shear, tenderness, spasms, trigger bands, surgical changes in the sacrum, and hypertonicity. *Id*. at 9-10. Finally, she argues the 2022 express care records concerned unrelated conditions and did not assess gait, strength, reflexes, or back range of motion, making the absence of corroborating findings unsurprising. *Id*. at 10.

The Commissioner responds the cited records support the ALJ's finding because they documented normal gait and station, no focal neurological deficits, negative straight-leg-raise testing, and no acute distress. ECF No. 11 at 6-7. He

also argues Ms. W.'s reliance on unperformed strength, reflex, and range-of-motion testing is misplaced because the ALJ did not rely on those findings. *Id*.

The ALJ's reliance on the clinical findings provides only partial support for discounting Ms. W.'s allegations. First, the ALJ's reliance on limited pain behavior does not meaningfully undermine Ms. W.'s allegations of chronic back pain. The Ninth Circuit has recognized a claimant with chronic pain may not necessarily present in acute distress. *See Reinertson v. Barnhart*, 127 F. App'x 285, 290 n.2 (9th Cir. 2005). Here, the same records documenting no acute distress also contained abnormal findings, including tenderness, paraspinal spasms, hypertonicity, and trigger bands. Tr. 386, 394, 397. The ALJ also acknowledged the August 2022 x-ray findings were consistent with Ms. W.'s allegations of back pain. Tr. 23.

The ALJ's reliance on Ms. W.'s normal gait provides limited support for discounting her allegations of disabling back pain. The Ninth Circuit recently explained normal gait, strength, and range of motion do not necessarily contradict allegations of disabling pain from degenerative disc disease. *Ortiz v. Bisignano*, 179 F.4th 691, 699-700 (9th Cir. 2026). Because pain may limit a claimant's ability to work even when strength and mobility remain intact, normal gait alone does not substantially undermine pain-based limitations. *Id*.

The absence of neurological deficits, however, provides some support for discounting Ms. W.'s allegations concerning right foot drop. An October 2019

examination documented no focal neurological deficits, and the December 2019 and early 2020 examinations documented normal gait and station. Tr. 386, 394, 397. Although those examinations did not include the strength, reflex, or range-of-motion testing later performed at the January 2024 consultative examination, the ALJ did not rely on normal findings from tests that were not performed.

Accordingly, substantial evidence supports the ALJ's finding that the record showed few documented neurological deficits before January 2024, providing some support for discounting Ms. W.'s allegations concerning foot drop. But the ALJ's reliance on normal gait and limited pain behavior did not provide a specific, clear, and convincing reason for discounting the alleged severity of her chronic back pain.

#### 4. January 2024 Examination

The ALJ next found Ms. W. "appeared to be more limited" at the January 2024 consultative examination. Tr. 23. She noted Ms. W. exhibited severe right foot drop, a slow and antalgic gait, 1/5 right-ankle dorsiflexion strength, decreased spinal range of motion, unstable tandem gait, an absent right-ankle reflex, and an inability to perform more than a partial squat. *Id*. Although the examining physician assessed limitations consistent with sedentary work, the ALJ found that opinion unpersuasive for the period before the established onset date. *Id*.

Ms. W. argues the January 2024 examination was the first time many of these functions were objectively tested and therefore does not establish the

limitations first appeared at that time. ECF No. 9 at 10-11. She also points to earlier references to right foot drop and severe spinal abnormalities, the absence of an intervening injury, and Dr. Schultz's October 2023 observation that she walked hunched over. *Id*.

The Commissioner responds the earlier records did not document comparable functional limitations and instead showed normal gait and station. ECF No. 11 at 7.

Substantial evidence supports the ALJ's narrower finding that Ms. W. appeared more limited at the January 2024 examination. Although right foot drop was part of Ms. W.'s medical history before then, an October 2019 examination documented no focal neurological deficits, and the December 2019 and January 2020 examinations documented normal gait and station. Tr. 386, 394, 397. Ms. W. also reported right foot drop in 2019 and bilateral leg numbness and weakness in December 2019, Tr. 388, 396, but those records did not document the marked gait and neurological abnormalities later observed in January 2024. By contrast, the January 2024 examination documented severe right foot drop, a slow and antalgic gait, 1/5 dorsiflexion strength, unstable tandem gait, an absent right-ankle reflex, decreased spinal range of motion, and only a partial squat. Tr. 440-41.

Dr. Schultz's October 2023 observation that Ms. W. walked hunched over and Ms. W.'s report of an abnormal swing gait suggest some gait impairment before January 2024. Tr. 429. But the January 2024 examination documented

substantially more detailed and severe abnormalities. Tr. 440-41.

Accordingly, substantial evidence supports the ALJ's finding that Ms. W. appeared more limited at the January 2024 examination. That documented difference provided a specific, clear, and convincing reason to discount allegations that comparable foot-drop-related limitations existed throughout the period at issue.

### 5. Improvement with Osteopathic Manipulative Treatment (OMT) and Yoga

The ALJ also relied on Ms. W.'s reports that OMT and yoga relieved her back pain. Tr. 23. She noted Ms. W. reported improved back pain with OMT in early 2020 and later reported improved symptoms while doing yoga daily. *Id*. The ALJ found that this improvement suggested Ms. W.'s back pain was less limiting than alleged. *Id*.

Ms. W. argues the ALJ improperly treated temporary improvement as inconsistent with disability. ECF No. 9 at 11-12. She notes OMT provided relief for only about three weeks before her pain returned and, although she later reported improvement with yoga, the record does not establish sustained improvement. *Id*. She also points to her October 2023 report that yoga helped while she continued to report significant pain. *Id*.

The Commissioner responds the ALJ did not find Ms. W.'s condition had permanently improved. Rather, the ALJ permissibly considered measures that

relieved her pain in determining how limiting her symptoms were. ECF No. 11 at 8.

In evaluating the intensity and persistence of a claimant's symptoms, regulations permit the ALJ to consider both "[t]reatment, other than medication," received for pain and "[a]ny measures" used to relieve pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(v)-(vi), 416.929(c)(3)(v)-(vi). Evidence of improvement, however, must be considered in the context of the claimant's overall diagnostic picture. *Ghanim v. Colvin*, 763 F.3d 1154, 1161-62 (9th Cir. 2014).

Substantial evidence supports the ALJ's finding that OMT and yoga provided some relief from Ms. W.'s back pain. In January 2020, Ms. W. reported OMT had helped for approximately three weeks, although her pain had returned by the time of the visit. Tr. 385. The following month, however, she reported some continuing relief from OMT, stated she was "feeling much better overall" and "quite thrilled" with her progress, attributed some of her improvement to daily yoga, and rated her pain at only 2/10. Tr. 382. In October 2023, Ms. W. again reported yoga and stretching made her feel better, although most other physical movement worsened her symptoms and she continued to report 8-10/10 spinal pain. Tr. 431.

Viewed in context, the ALJ reasonably inferred from Ms. W.'s repeated reports of relief that her back pain was less limiting than alleged. Tr. 23. Because the record reasonably supports that inference, the Court may not substitute a

different interpretation of the evidence. *See Burch*, 400 F.3d at 679. Accordingly, the relief provided by OMT and yoga was a specific, clear, and convincing reason to discount the alleged severity of Ms. W.'s back pain.

### 6. Ability to Lift 10-20 Pounds

The ALJ also found Ms. W.'s reported ability to lift and carry 10-20 pounds supported the conclusion she could perform light work with standing and walking limited to four hours. Tr. 23. Earlier in the decision, however, the ALJ acknowledged Ms. W. stated in the same function report she could stand for no more than five minutes and walk no more than 25 feet without resting. Tr. 22, 344.

Ms. W. argues the ALJ selectively relied on her lifting estimate while disregarding her more restrictive standing and walking limitations. ECF No. 9 at 12. She points to her June 2022 function report, in which she stated she could not lift more than 10 pounds or walk longer than 30 minutes, and her later report, in which she estimated she could lift 10-20 pounds but could stand for no more than five minutes. *Id.* She contends her reported limitations are consistent with sedentary work and disability under the Medical-Vocational Guidelines. *Id.*

The Commissioner responds the ALJ reasonably relied on Ms. W.'s own estimate of her lifting ability. ECF No. 11 at 8. He argues Ms. W. merely offers a different interpretation of the evidence, which does not establish error. *Id*.

Substantial evidence supports the ALJ's finding concerning Ms. W.'s lifting ability. In her September 2023 function report, Ms. W. estimated she could lift 10-

20 pounds. Tr. 344. As Ms. W. points out, however, she also stated in the same report she could stand for no more than five minutes and walk no more than 25 feet before resting. *Id.* Her earlier June 2022 function report similarly stated she could not lift more than 10 pounds or walk for longer than 30 minutes. Tr. 305. Although these statements could support greater limitations, the ALJ expressly acknowledged Ms. W.'s reported standing and walking restrictions. Tr. 22. The ALJ also considered her lifting estimate alongside the medical and other evidence discussed above in assessing her physical functioning. Tr. 22-23. Resolving conflicts in the evidence is the ALJ's responsibility, and where the evidence is susceptible to more than one rational interpretation, the ALJ's interpretation must be upheld. See Burch, 400 F.3d at 679. The ALJ therefore did not err by considering Ms. W.'s reported lifting ability as one factor in assessing her physical limitations.

### 7. Mental Impairment

The ALJ next found Ms. W.'s mental symptoms warranted some limitations, but not limitations beyond simple work with occasional changes. Tr. 24. She noted Ms. W. had not alleged a mental impairment and had received no notable mental health treatment, but recognized her back pain could interfere with concentration and her somatic focus could affect her ability to handle stress and changes. *Id*. The ALJ therefore limited Ms. W. to simple instructions and work-related decisions and occasional changes in a routine work setting. *Id*. In support, she relied on the

October 2023 psychological examination, which showed generally intact memory and concentration apart from one error on serial sevens. *Id*.

Ms. W. contends it is unclear whether the ALJ relied on her failure to allege a mental impairment or obtain mental health treatment as a reason to discount her symptom allegations. ECF No. 9 at 12-13. She contends the absence of treatment for a condition she did not allege cannot provide a valid basis for discounting her testimony. *Id*.

The Commissioner responds that Ms. W. misreads the decision. ECF No. 11 at 8-9. He argues the ALJ cited the psychological examination not to discount Ms. W.'s physical symptom allegations, but to support the mental limitations included in the RFC. *Id*.

In reply, Ms. W. argues that merely reciting evidence supporting the RFC does not provide a clear and convincing reason for discounting symptom testimony. ECF No. 12 at 7.

The ALJ did not rely on Ms. W.'s failure to allege a mental impairment or obtain mental health treatment as a reason to discount her symptom allegations. Rather, the ALJ discussed those facts in determining the mental limitations warranted by the record. Tr. 24. Because the ALJ did not use Ms. W.'s lack of a mental health allegation or treatment to discount her symptom testimony, Ms. W has not shown error on this basis.

8. Activities of Daily Living

The ALJ also found Ms. W.'s daily activities partially supported the RFC and suggested she was less physically limited than alleged. Tr. 24-25. She found Ms. W.'s care for her grandson, meal preparation, driving, shopping, and management of money supported her ability to sustain concentration and persistence for simple tasks. Tr. 24. As to physical functioning, the ALJ emphasized Ms. W.'s September 2023 report that she shopped for two to three hours, two to three times per week, her gardening, and a 2022 report that she worked daily with her hands growing marijuana. *Id.* She also considered Ms. W.'s reports of performing housework intermittently and the absence of significant or persistent activity limitations reported to providers. Tr. 24-25.

Ms. W. argues her daily activities neither contradict her alleged limitations nor demonstrate an ability to sustain full-time work. ECF No. 9 at 13-16. She contends the ALJ overstated her childcare responsibilities, incorrectly found she shopped in stores in June 2022, and failed to account for her reported difficulties with personal care, need for assistance with household chores, and frequent breaks. *Id.* at 13-14. She also argues the record does not establish the duration or physical demands of her gardening and marijuana-related activities. *Id.* at 14-15. Finally, she contends her later reports of shopping and other activities must be considered alongside her significant standing and walking limitations, that she reported limitations in daily activities to providers, and that her ability to perform yoga does

not contradict her allegations. *Id.* at 15-16.

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Ms. W.'s activities. ECF No. 11 at 9.

Daily activities may support discounting a claimant's symptom allegations when they contradict the claimant's testimony or involve skills transferable to a work setting and occupy a substantial part of the claimant's day. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). But home activities may differ substantially from workplace demands, particularly where they can be performed with breaks, assistance, or flexibility. *Garrison*, 759 F.3d at 1016. The ALJ must therefore consider the nature of the activities and any limitations in how they are performed. *See Trevizo v. Berryhill*, 871 F.3d 664, 682 (9th Cir. 2017); *Revels v. Berryhill*, 874 F.3d 648, 667-68 (9th Cir. 2017).

Substantial evidence supports the ALJ's findings concerning Ms. W.'s reported activities. Ms. W. reported caring for her grandson, preparing meals, driving, shopping, and managing money. Tr. 301-04, 332-35. Although Ms. W. correctly points out her grandson was 16 years old at the hearing and her caregiving responsibilities primarily involved ensuring he attended school, ate, and completed chores, Tr. 101, 332, the ALJ did not rely on those activities to establish she could perform physically demanding childcare work. Rather, the ALJ reasonably considered them as evidence of her ability to sustain concentration and persistence for simple tasks. *See* Tr. 24.

Substantial evidence also supports the ALJ's findings concerning Ms. W.'s shopping and personal-care activities. Although the ALJ incorrectly characterized Ms. W.'s June 2022 function report as indicating she shopped in stores, Ms. W.'s September 2023 report identified shopping in stores, by phone, by mail, and by computer for two to three hours, two to three times per week. Tr. 24, 303, 334. She also identified the grocery store as a place she regularly visited and reported she did not need someone to accompany her. Tr. 304, 335. Further, although Ms. W. reported difficulties with personal care in June 2022, she indicated no such difficulties in her September 2023 report. Tr. 301, 332. At the same time, Ms. W. reported significant standing and walking limitations and needing assistance with household chores, and later stated her housekeeper performed the shopping. Tr. 333, 344, 435. The ALJ acknowledged Ms. W.'s reported need for assistance and her performance of household tasks intermittently. Tr. 24. Although the evidence could support greater limitations, the ALJ reasonably interpreted Ms. W.'s reported activities as inconsistent with the degree of physical limitation she alleged. Where the evidence is susceptible to more than one rational interpretation, the ALJ's interpretation must be upheld. *See Burch*, 400 F.3d at 679-81.

The ALJ also considered Ms. W.'s gardening and work with marijuana plants. Tr. 24. Ms. W. reported gardening a few times during "nicer" months, and a November 2022 treatment note documented she worked daily with her hands planting marijuana plants. Tr. 335, 419. Although these activities provide some

additional support for the ALJ's assessment, the record does not establish their duration or the amount of standing, walking, or lifting involved.

The ALJ further noted Ms. W. had not reported significant or persistent limitations in her daily activities to treatment providers. Tr. 25. Ms. W. correctly points out she reported in October 2019 that pain prevented her from vacuuming. Tr. 392. She also reported performing housework in spurts and receiving assistance with chores, which the ALJ acknowledged. Tr. 24, 435, 440. Thus, the ALJ's general observation about the absence of reported activity limitations provides limited additional support for discounting Ms. W.'s allegations. Similarly, although the record does not establish the physical demands of Ms. W.'s daily yoga, the ALJ permissibly considered her reported relief from yoga in evaluating the severity of her back pain, as discussed above.

Accordingly, substantial evidence supports the ALJ's findings concerning Ms. W.'s daily activities, particularly her reported shopping and personal-care activities. Although Ms. W. identifies evidence supporting greater limitations, the ALJ reasonably interpreted those activities as inconsistent with the alleged severity of her physical symptoms. Because the ALJ relied on that inconsistency, she was not required to establish Ms. W.'s activities demonstrated transferable work skills or an ability to sustain full-time employment. *See Orn*, 495 F.3d at 639. The ALJ therefore provided a specific, clear, and convincing reason for discounting Ms. W.'s physical symptom allegations on this basis.

9. Harmless Error

A district court "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). An error in evaluating symptom testimony is harmless when the ALJ provides other specific, clear, and convincing reasons, supported by substantial evidence, that adequately support the ultimate symptom evaluation. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008). The party appealing the ALJ's decision generally bears the burden of establishing harm. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

Here, the ALJ provided several specific, clear, and convincing reasons for discounting Ms. W.'s symptom testimony. Those reasons include Ms. W.'s inconsistent explanations for why she stopped working, the absence of a significant increase in symptoms around the alleged onset date, her limited treatment for back pain, the difference between the comparatively limited neurological findings before January 2024 and the more significant abnormalities documented at the January 2024 examination, her reported relief from OMT and yoga, her reported ability to lift 10-20 pounds, and her reported shopping and personal-care activities. These reasons are based on factual findings supported by substantial evidence and, taken together, adequately support the ALJ's evaluation of Ms. W.'s symptom testimony. Although some of the ALJ's additional findings did not provide sufficient grounds for discounting Ms. W.'s symptom allegations, those

deficiencies do not undermine the valid reasons discussed above. Any resulting error was therefore harmless. *See Carmickle*, 533 F.3d at 1162-63.

B. Medical Opinion Evidence

Ms. W. next challenges the ALJ's assessment of the medical opinion evidence. Specifically, she challenges the ALJ's assessment of Dr. Leinenbach's opinion and Dr. Wayne H.'s prior administrative medical finding. Her arguments are discussed in turn after a review of the relevant legal standards.

An ALJ must consider and evaluate the persuasiveness of all medical opinions and prior administrative medical findings. 20 C.F.R. §§ 404.1520c, 416.920c. Supportability and consistency are the most important factors in evaluating persuasiveness, and the ALJ must explain how both factors were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Stiffler v. O'Malley*, 102 F.4th 1102, 1106 (9th Cir. 2024). The ALJ generally need not explain how the remaining factors were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

"Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022) (quoting 20 C.F.R. § 404.1520c(c)(1)). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)); *see also* 20 C.F.R. §§ 416.920c(c)(1)-(2). An ALJ may find a medical opinion unsupported

or inconsistent, but the ALJ's explanation must be supported by substantial evidence. *Woods*, 32 F.4th at 792.

1. Derek Leinenbach, M.D.

Dr. Leinenbach examined Ms. W. in January 2024 and assessed she could lift and carry 10 pounds, stand and walk for one to two hours, and sit for six to eight hours in an eight-hour workday. Tr. 442. He also assessed she should not climb or balance, could only occasionally crouch, crawl, or stoop, should avoid unprotected heights, and would need a cane for long distances or uneven terrain. *Id*.

The ALJ found Dr. Leinenbach's opinion unpersuasive for evaluating Ms. W.'s functioning before the established onset date. Tr. 28. As to supportability, the ALJ found Dr. Leinenbach's examination supported his standing and walking restrictions because Ms. W. exhibited a slow and antalgic gait, severe right foot drop, 1/5 right-ankle dorsiflexion strength, unstable tandem gait, an absent right-ankle reflex, decreased spinal range of motion, partial forward flexion while walking, and an inability to fully squat. *Id*. But the ALJ found Ms. W.'s otherwise normal strength, particularly in her upper extremities, provided less support for limiting lifting and carrying to 10 pounds. *Id*. As to consistency, the ALJ found Dr. Leinenbach's opinion inconsistent with the earlier record, relying on Ms. W.'s limited treatment, improvement with OMT and yoga, limited pain behavior, lack of neurological deficits in early 2020, normal gait before January 2024, and report she could lift and carry 10-20 pounds. *Id*.

Ms. W. contends Dr. Leinenbach's limitations would restrict her to sedentary work and direct a finding of disability under the Medical-Vocational Guidelines. ECF No. 9 at 17. She contends the ALJ's consistency analysis relied on many of the same findings used to discount her symptom allegations and fails for the same reasons. *Id*.

The Commissioner responds an opinion may be supported by the source's examination yet inconsistent with the longitudinal record. ECF No. 11 at 11-12. He argues substantial evidence supports the ALJ's reliance on Ms. W.'s limited treatment, improvement with yoga and treatment, lack of neurological deficits, normal examination findings, and reported ability to lift up to 20 pounds. *Id*.

In reply, Ms. W. maintains the ALJ's reasoning remains flawed because the cited evidence did not actually contradict Dr. Leinenbach's limitations and because the record was not fully developed. ECF No. 12 at 8.

An ALJ may find a medical opinion unpersuasive even when the opinion is supported by the source's own examination if it is inconsistent with the longitudinal record. *Allen v. Kijakazi*, No. 22-35056, 2023 WL 2728857, at *1 (9th Cir. Mar. 31, 2023) (unpublished).

Substantial evidence supports the ALJ's finding that Dr. Leinenbach's standing and walking restrictions were inconsistent with the longitudinal medical evidence before the established onset date. The ALJ acknowledged Dr. Leinenbach's January 2024 examination supported those restrictions. Tr. 28. But

the earlier examinations did not document comparable gait or neurological abnormalities. In October 2019, examination showed normal spinal range of motion and no focal neurological deficit. Tr. 394. In December 2019 and January 2020, Ms. W. had normal gait and station. Tr. 397, 386. As discussed above, Dr. Schultz observed Ms. W. walking hunched over in October 2023, Tr. 429, but that evaluation did not document the marked neurological abnormalities later recorded by Dr. Leinenbach. By contrast, Dr. Leinenbach's January 2024 examination documented a slow and antalgic steppage gait, severe right foot drop, 1/5 right-ankle dorsiflexion strength, unstable tandem gait, an absent right-ankle reflex, decreased lumbar range of motion, and calf asymmetry. Tr. 440-41. The ALJ reasonably concluded Dr. Leinenbach's one-to-two-hour standing and walking restriction, although supported by his January 2024 examination, was inconsistent with the earlier clinical record, which did not document comparable gait or neurological abnormalities.

The ALJ also relied on Ms. W.'s limited treatment and reported improvement with OMT and yoga. Tr. 28. As discussed above, those findings are supported by the record and provide additional support for the ALJ's conclusion that Dr. Leinenbach's January 2024 restrictions did not reflect Ms. W.'s functioning throughout the earlier period.

The ALJ also found Dr. Leinenbach's examination provided less support for his 10-pound lifting restriction because, apart from right-ankle dorsiflexion, Ms.

W. demonstrated 5/5 strength in the upper and lower extremities. Tr. 28, 441. Ms. W.'s separate report that she could lift 10-20 pounds also provided some evidence inconsistent with a 10-pound maximum. Tr. 344. Substantial evidence therefore supports the ALJ's evaluation of Dr. Leinenbach's lifting restriction.

Accordingly, substantial evidence supports the ALJ's evaluation of Dr. Leinenbach's opinion. The ALJ reasonably found his standing and walking restrictions were inconsistent with the longitudinal medical evidence before the established onset date and his 10-pound lifting restriction was less supported by his examination findings. The ALJ therefore did not err in finding Dr. Leinenbach's opinion unpersuasive for that earlier period.

2. Wayne H., M.D.

At reconsideration, state agency medical consultant Dr. Wayne H. found the evidence insufficient to evaluate Ms. W.'s physical functioning before the June 2021 date last insured. Tr. 146. For the current Title XVI period, however, he assessed a reduced range of light work, including lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for four hours, and sitting for about six hours in an eight-hour workday, with additional postural and environmental limitations. Tr. 149-50.

The ALJ found Dr. Wayne H.'s current period assessment persuasive. Tr. 25-26. Although Dr. Wayne H. found insufficient evidence to assess the period before the date last insured, the ALJ found the developed record sufficient and

inferred that, given the gradually progressive nature of degenerative arthropathy, Ms. W.'s spinal disorder would not reasonably have been more limiting during the earlier period than afterward. Tr. 25. The ALJ also found Dr. Wayne H.'s assessment supported by his consideration of the lumbar imaging and January 2024 examination and consistent with Ms. W.'s otherwise normal strength, limited treatment, and report she could lift 10-20 pounds. Tr. 26.

Ms. W. contends the January 2024 examination does not support Dr. Wayne H.'s assessment because it documented significant abnormalities bearing on her ability to stand and walk, including an antalgic gait, severe right foot drop, unstable tandem gait, and 1/5 right-ankle strength. ECF No. 9 at 17-18. Ms. W. also renews her objections to the ALJ's reliance on limited treatment and her report she could lift up to 20 pounds. *Id*. The Commissioner responds the ALJ reasonably interpreted the evidence. ECF No. 11 at 12. In reply, Ms. W. emphasizes Dr. Leinenbach interpreted the same January 2024 examination as supporting substantially greater limitations. ECF No. 12 at 8-9.

Substantial evidence supports the ALJ's evaluation of Dr. Wayne H.'s assessment. Dr. Wayne H. considered Ms. W.'s slow and antalgic gait, partial forward flexion, severe right foot drop with steppage gait, unstable tandem gait, partial squat, lumbar tenderness, 1/5 right-ankle dorsiflexion strength, and decreased lumbar range of motion. Tr. 146. His notation that there were "no neuro deficits otherwise" followed his identification of those abnormalities; it did not

characterize the examination as neurologically normal. Tr. 150. He nevertheless concluded those findings, together with the lumbar imaging, supported standing and walking for four hours and otherwise a reduced range of light work. Tr. 149-50. Dr. Leinenbach interpreted substantially the same examination findings as supporting greater limitations. But where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld. Woods, 32 F.4th at 788. The ALJ reasonably found Dr. Wayne H.'s assessment persuasive. Accordingly, substantial evidence supports the ALJ's evaluation of Dr. Wayne H.'s assessment.

### C. Step Five - Parking Lot Attendant Occupation

At step five, the ALJ found that, before December 3, 2023, an individual with Ms. W.'s age, education, work experience, and RFC could perform four representative occupations: production assembler, with 9,000 jobs nationally; parking lot attendant, with 25,000 jobs nationally; office helper, with 4,000 jobs nationally; and agricultural produce sorter, with 4,000 jobs nationally. Tr. 29. Based on the vocational expert's testimony, the ALJ concluded these occupations, totaling 42,000 jobs nationally, existed in significant numbers in the national economy. Tr. 29-30, 109. Ms. W. challenges only the parking lot attendant occupation. ECF No. 9 at 18-20.

Ms. W. challenges the parking lot attendant occupation on two grounds. She argues its frequent exposure to weather conflicts with the RFC limitation to

occasional exposure to extreme temperatures and its driving duties are incompatible with her severe right foot drop and 1/5 right-ankle strength, as well as the RFC limitation to occasional exposure to hazards. ECF No. 9 at 19-20. She contends that, without this occupation, the remaining 17,000 jobs are insufficient at step five. *Id*. at 20.

The Commissioner responds weather and extreme temperatures are distinct environmental conditions and Ms. W.'s foot drop argument depends on a limitation the ALJ did not include in the RFC. ECF No. 11 at 13.

In reply, Ms. W. maintains her right-foot limitation is objectively documented and should have been considered in evaluating the occupation's driving duties. ECF No. 12 at 9. She also argues frequent exposure to weather can entail exposure to extreme temperatures and contends the Commissioner does not dispute the remaining 17,000 jobs would be insufficient. ECF No. 12 at 9-10.

At step five, the Commissioner bears the burden of showing the claimant can perform work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). There is no bright-line rule for what constitutes a significant number of jobs. *Gutierrez v. Commissioner of Social Security*, 740 F.3d 519, 528 (9th Cir. 2014). The Ninth Circuit has held 25,000 jobs nationally constitutes a significant number, although it characterized that figure as a "close call," while 1,680 jobs nationally does not. *Id*. at 529; *Beltran v. Astrue*, 700 F.3d 386, 390 (9th Cir.

2012).

Here, neither of Ms. W.'s arguments establishes error. First, the parking lot attendant occupation does not conflict with the RFC limitation to occasional exposure to extreme temperatures. The DOT entry for parking lot attendant, DOT 915.473-010, identifies exposure to weather as frequent but exposure to extreme cold and extreme heat as not present. *See* DICOT 915.473-010, 1991 WL 687865; U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (1993) (DOT No. 915.473-010).

Ms. W. argues in reply that frequent exposure to weather may include exposure to extreme outdoor temperatures. ECF No. 12 at 9-10. But the SCO separately classifies weather, extreme cold, and extreme heat, and the agency defines extreme cold and extreme heat as exposure to nonweather-related temperatures. *See* POMS DI 25001.001(A)(22), (26)-(27). Thus, the occupational classification does not establish the parking lot attendant occupation requires exposure to extreme temperatures exceeding the RFC limitation.

Ms. W.'s foot drop argument likewise does not establish error. The ALJ found degenerative disc disease with right foot drop to be a severe impairment, Tr. 20, and the January 2024 examination documented 1/5 right-ankle dorsiflexion strength, Tr. 441. But neither finding establishes a separate limitation on driving or operating foot controls, and the RFC contains no such limitation. Tr. 21. As discussed above, substantial evidence supports the ALJ's physical RFC and her

evaluation of the medical evidence concerning Ms. W.'s foot drop. The ALJ's hypothetical to the vocational expert included the limitations contained in that RFC, and the vocational expert identified the parking lot attendant occupation in response. Tr. 108-09. Ms. W. cannot establish step-five error by relying on an additional functional limitation that the ALJ reasonably did not include in the RFC. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175-76 (9th Cir. 2008) (rejecting a step-five challenge based on limitations omitted from the RFC where the claimant merely restated arguments challenging the RFC that the court had already rejected).

Ms. W. also argues the occupation's driving duties conflict with the RFC limitation to occasional exposure to hazards. ECF No. 9 at 19. But the agency uses "hazards" to refer to specified environmental conditions, including moving mechanical parts, electrical shock, high exposed places, radiation, explosives, and toxic or caustic chemicals. POMS DI 25015.020. Ms. W. identifies no authority establishing that operating an automobile constitutes exposure to a "hazard" within the meaning of the RFC. Moreover, the RFC permits occasional exposure to hazards, Tr. 21, and Ms. W. identifies no evidence the parking lot attendant occupation requires hazard exposure exceeding that limitation.

Separately, Ms. W. contends the asserted conflicts between the parking lot attendant occupation and her RFC required the ALJ to inquire further and obtain an explanation from the vocational expert. ECF No. 9 at 19-20; ECF No. 12 at 9-10.

Effective January 6, 2025, however, SSR 24-3p rescinded and replaced SSR 00-4p and no longer requires adjudicators to identify and resolve conflicts between vocational-expert testimony and the DOT. SSR 24-3p, 89 Fed. Reg. 97158, 97159, n.1 (Dec. 6, 2024). Because Ms. W.'s claim remained pending after that date, SSR 24-3p governed the ALJ's February 2025 hearing and March 2025 decision.

Under SSR 24-3p, the ALJ instead evaluates whether the vocational evidence, considered in the context of the overall record, is adequate to support the step-five finding, including whether the vocational expert identified the sources of the data used and, where applicable, explained the general approach used to estimate job numbers. *Id.* at 97159. Here, the vocational expert identified his data sources and explained his methodology, Tr. 109-11, and the ALJ expressly accepted that testimony under SSR 24-3p, Tr. 30.

Accordingly, substantial evidence supports the ALJ's reliance on the vocational expert's testimony that Ms. W. could perform the parking lot attendant occupation. Because that occupation accounts for 25,000 jobs nationally and the four occupations together account for 42,000 jobs, Tr. 29, 109, the Court need not decide whether the remaining 17,000 jobs alone would constitute a significant number in the national economy. The ALJ did not err at step five.

## CONCLUSION

For the reasons discussed above, the ALJ did not fail to develop the record, substantial evidence supports the ALJ's evaluation of Ms. W.'s symptom

testimony and the medical opinion evidence, and the ALJ did not err at step five. The Court therefore affirms the Commissioner's decision.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Brief, **ECF No. 9**, is **DENIED**.
2. Defendant's Brief, **ECF No. 11**, is **GRANTED**.

**IT IS SO ORDERED**. The District Court Clerk is directed to enter this Order and provide copies to counsel. Judgment shall be entered for Defendant and the file shall be **CLOSED**.

**DATED** October 14, 2026.

REBECCA L. PENNELL
United States District Judge